William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
BAUMARINE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BAUMARINE AS,

                Plaintiff,

      -against-

LIBRA SHIPPING SERVICES L.L.C.,

                Defendant.

---

08 Civ. **2807 (Sullivan)**

**VERIFIED COMPLAINT**

*FILED: 3/17/2008*

Plaintiff, Baumarine AS ("Baumarine" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Libra Shipping Services L.L.C. ("Libra" or "Defendant") alleges, upon information and belief, as follows:

      1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

      2.     At all times material herein, plaintiff Baumarine was and is a business entity organized and existing under the laws of Norway and maintains a place of business at Harbitzalléen 2 A, P.O. Box 182, Skøyen, NO-0212 Oslo, Norway.

      3.     Upon information and belief, at all times material herein, defendant Libra is and was a business entity organized and existing under the laws of Dubai with its principal

place of business at 4th Floor, Standard Chartered Bank Building, Al Mankool Road, Bur Dubai, Dubai, United Arab Emirates, P.O. Box 27184, Dubai, United Arab Emirates.

4.    On or about March 30, 2007 Baumarine and Libra entered into a time charter party whereby Baumarine, as time chartered owner, agreed to let and Libra, as charterer, agreed to hire the "Songa Hui" (the "Vessel"), under an amended New York Produce Exchange form (the "Charter"), for a time chartered trip with a cargo of coal. A true and correct copy of the Charter is attached as Exhibit 1.

5.    Under Clause 7 of the Charter, Libra was to "supply bunkers of quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specifications ["Specifications"] set out in Appendix A [to the Charter]."

6.    Shortly after delivery of the Vessel under the Charter, Libra caused to be delivered 849.84 m/t of IFO 180 CST bunkers at Mundra, India (the "Mundra bunkers") which were stored in fuel oil tank 1C ("FOT 1C").

7.    After consuming the bunkers in another fuel oil tank, the Vessel switched to the Mundra bunkers.

8.    Almost immediately, the Vessel encountered problems as the fuel oil filters and purifiers became clogged with sludge rendering them inefficient and, in some instances, inoperable.

9.    As the result of those problems, the Vessel switched to bunkers other than the Mundra bunkers whereupon the problems with the fuel oil filters and purifiers ceased.

10.    After the completion of the voyage, Baumarine attempted to redeliver the Vessel to its registered owner, Songa Shipping Pte. Ltd. ("Songa"), but Songa delayed in accepting redelivery until the off-Specification Mundra bunkers were  removed.

11.    Baumarine and Songa agreed that redelivery should occur at the same time that Songa delivered the Vessel to Cardiff Marine Inc. under a sales agreement dated April 11, 2007.

12.    Upon analysis of the Mundra bunkers by independent testing facilities, it was found that they were in violation of the Specifications.  Due to problems encountered by the Vessel, the Mundra bunkers also were found not of a suitable quality for burning in the Vessel's engines.  As a result of supplying off-Specification and unsuitable bunkers, Libra breached the Charter and that breach caused Baumarine to incur significant damages.

13.    The damages suffered by Baumarine as the result of Libra's breach equal a total of $632,541.05 which is comprised of the following amounts:

a)    Cost of replacement bunkers and related expenses:  $359,936.49.

b)    Lost time due to a delay in redelivery of the Vessel by Baumarine to Songa (3.37638 days at $39,750 per day):  $134,211.45.

c)    Claim by Songa for the value of the lost time incurred by Cardiff, a claim that the Songa agreed to pay:  $138,393.11.

14.    Libra has failed to pay any of those amounts due under the Charter.

15.    Clause 45(b) of the Charter calls for arbitration in London in accordance with English law.  Baumarine has commenced an arbitration in London and arbitration proceedings are continuing.

16.    While the disputes arising out of the Charter, and described above, are to be arbitrated in London, this action is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8.  This action is not and should not be considered a waiver of Baumarine's rights to arbitrate in London under clause 45(b) of the Charter.

17.    Under English law and in London arbitration, charter party awards regularly include costs, including attorney's fees.

18.    Upon information and belief it is estimated that it will take one year further to arbitrate this dispute to conclusion, resulting in the following estimated interest, attorneys' fees and costs:

Interest:                          $ 65,091.07 ($632,541.05 x 0.06/year

                                   from July 1, 2007 through March 27, 2009)

Attorneys' fees and other costs:    $200,000.00

19.    Baumarine's total estimated damages are $897,632.12, i.e., the total of the amounts set forth in paragraphs 13 and 18 above.

20.    Libra is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name(s) of Libra Shipping Services, L.L.C. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Baumarine AS prays:

1.    That a summons with process of attachment and garnishment may be issued against the defendant Libra Shipping Services L.L.C. and if defendants cannot be found, then that its goods, chattels and credits within the district, and particularly all bank accounts and other property of Libra Shipping Services L.L.C. with the financial institutions noted above in paragraph 19, may be attached in an amount sufficient to answer plaintiff's claim;

2.    That defendant Libra Shipping Services L.L.C. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.      That judgment be entered in favor of Baumarine AS and against Libra Shipping Services L.L.C. in the amount of US$897,632.12 (including estimated interest, expenses and attorneys' fees plus interest); and,

4.      That this Court grant Baumarine AS such other and further relief which it may deem just and proper.

Dated: New York, New York
      March 17, 2008

                                    HOLLAND & KNIGHT LLP

By:   _____
                            William J. Honan
                            Christopher R. Nolan
                            195 Broadway
                            New York, NY 10007-3189
                            Tel:   (212) 513-3200
                            Fax:   (212) 385-9010

                            *Attorneys for Plaintiff*
                            *Baumarine AS*

## VERIFICATION

STATE OF NEW YORK            )
                             :ss.:
COUNTY OF NEW YORK           )

      WILLIAM J. HONAN, being duly sworn, deposes and says:

      I am a member of the firm of Holland & Knight LLP, counsel for Baumarine AS ("Baumarine"), plaintiff in the foregoing action.  I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge.  I have reviewed documentation provided to me by Baumarine and corresponded with Baumarine's representatives regarding this matter.  I am authorized by Baumarine to make this verification, and the reason for my making it as opposed to an officer or director of Baumarine is that there are none within the jurisdiction of this Honorable Court.

                                 _____
                                   William J. Honan

Sworn to before me this
17 day of March, 2008

_____
Notary Public

Linda M. Wilkens
Notary Public, State of New York
No. 01WI9672455
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 30, 2010____

# 5185381_v1

# EXHIBIT 1

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council(BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)



# TIME CHARTER®
New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in  *Dubai*................................................................. | 1 |
| this *30th* ................................................................ day of  *March* ................................................. ~~19~~ *2007*..... | 2 |
| | |
| Between  *BAUMARINE A.S., OSLO, NORWAY*................................................................................ | 3 |
| | 4 |
| Owners of the Vessel described below, and  ................................................................................. | 5 |
| *LIBRA  SHIPPING SERVICES L.L.C., DUBAI* .......................................................................... | 6 |
| | 7 |
| Charterers. | 8 |
| | |
| Description of Vessel | 9 |
| | |
| Name  *M/V 'SONGA HUI '* ............................... Flag  .......*MHL flag* .................. Built  .........*2001* ................ (year). | 10 |
| ~~Port and number of Registry~~ ................................................................................................... | 11 |
| ~~Classed~~.................................................................~~in~~................................................................ | 12 |
| ~~Deadweight~~................................................~~long\*/metric\* tons (cargo and bunkers, including freshwater and~~ | 13 |
| ~~stores not exceeding~~...............................................~~long\*/metric\* tons) on a salt water draft of~~.............................. | 14 |
| ~~on summer freeboard.~~ | 15 |
| ~~Capacity~~...................................~~cubic feet grain~~................................................~~cubic feet bale space.~~ | 16 |
| ~~Tonnage~~................................................................................................................~~GT/GRT.~~ | 17 |
| ~~Speed about~~.................................................~~knots, fully laden, in good weather conditions up to and including maximum~~ | 18 |
| ~~Force~~ ............~~on the Beaufort wind scale, on a consumption of about~~............................................~~long\*/metric\*~~ | 19 |
| ~~tons of~~.................................................................................................................................................~~.~~ | 20 |
| | |
| *~~\* Delete as appropriate.~~* | 21 |
| *For further description see Appendix "A" (if applicable)* | 22 |
| | |
| **1.    Duration** | 23 |
| | |
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for ~~a period~~ | 24 |
| *One Timecharter trip via safe port(s), safe berth(s), safe anchorage(s), always within Institute Warranty Limits, with* | 25 |
| *Charterers' intended cargo of coal in bulk via Richards Bay Coal Terminal to West Coast India - duration about 30 days* | 26 |
| *without guarantee,* ................................................................................................................ | 27 |
| ................................................................................... within below mentioned trading limits. | 28 |
| | |
| **2.    Delivery** | 29 |
| | |
| The Vessel shall be placed at the disposal of the Charterers ~~at~~ *on passing Muscat outbound, any time day or night,* | 30 |
| *Sundays and holidays included,* ................................................................................................ | 31 |
| | 32 |
| ....................................................................... The Vessel on her  *arrival first loadport* ~~delivery~~ | 33 |
| shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted | 34 |
| for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear | 35 |
| simultaneously. *(See Clause 47).* | 36 |
| | |
| The Owners shall give the Charterers not less than ..... *10/5/3/1* ........................... days notice of expected date of | 37 |
| delivery. | 38 |
| | |
| **3.    On-Off Hire Survey** | 39 |

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their~~ 40
~~respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct~~ 41
~~joint on-hire/off hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~ 42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~ 43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~ 44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ 45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~ 46
~~On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~ 47

*Joint on/off hire survey to be carried out on deliery or first loading port and redelivery port to ascertain the vessel's*
*condition and bunker quantities remaining on board on delivery/redelivery by one surveyor acceptable to the both*
*parties.  Time for on-hire survey to be for Owners' account and time for off-hire survey to be for Charterers' account*
*but the cost to be equally shared between both parties.*

4.    **Dangerous Cargo/Cargo Exclusions**                                                              48

(a) The Vessel shall be employed in carrying lawful *harmless* merchandise *in bulk* excluding any goods of a  49
dangerous,
injurious, flammable or corrosive nature ~~unless carried in accordance with the requirements or~~ 50
~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~ 51
~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~ 52
~~pass. Without prejudice to the generality of the foregoing, in addition the following are specifically~~ 53
~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,~~ 54
  *go to be coal in bulk only.*................................................................................... 55
*Cargo to be loaded as per IMO BC Code/U.S. Coast Guard or similar authorities' regulations including SOLAS,* 56
*Department of Trade Recommendations.   Vessel must not load goods subject to boycott and/or embargo.* 57
................................................................................................................. 58
................................................................................................................. 59
................................................................................................................. 60
................................................................................................................. 61
................................................................................................................. 62
................................................................................................................. 63
................................................................................................................. 64

(b) ~~If IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~......................................................tons and the Charterers shall provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

5.    **Trading Limits**                                                                                 70

The Vessel shall be employed in such lawful trades between safe ports, *safe anchorages* and safe places  71
*always trading*
    in *I.W.L.*................................................................................................... 72
..................................................................................................... excluding 73
*the countries mentioned in Clause 69*................................................................... 74
................................................................................................................. 75
.................................................................................... as the Charterers shall direct. 76

6.    **Owners to Provide**                                                                              77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for  78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water *and lubricating oil*;  79
shall pay for
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the  80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and  81
equipment for and during the service, and have a full complement of officers and crew.  82

7.    **Charterers to Provide**                                                                          83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise  84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory  85

garbage disposal), all communication expenses pertaining to the Charterers' business at cost, *compulsory or* 86
*recommended* pilotages,
towages, agencies, commissions, consular charges (except those pertaining to individual crew members 87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel 88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all 89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew 90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while 91
the Vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations~~ 92
~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~ 93
~~months or more.~~ 94

The Charterers shall provide and pay for necessary dunnage and also any extra *cargo* fittings requisite for a 95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage *or other fittings,* 96
*equipment* already aboard
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in 97
their time *and risk.* 98

### 8.    Performance of Voyages 99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance 100
with the Vessel's crew. The Master shall be conversant with the English language and (although 101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards 102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to 103
ʼing, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk 104
and expense, under the supervision of the Master. *(See Clause 50).* 105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or 106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if 107
necessary, make a change in the appointments. 108

### 9.    Bunkers 109

(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and 110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with: 111
*about 1,500 MTS IFO* ............... ~~long*/metric* tons of fuel oil~~ at the price of .....USD330.00 ............... per *metric* ton; 112
*and about 50 metric* tons of *marine* diesel oil at the price of ......USD600.00 ............ per *metric* ton. The vessel shall 113
be redelivered with: *about same quantities as on delivery at the same prices.* ~~tons of fuel oil at the price of~~ ..~~per ton;~~ 114
.................................................~~tons of diesel oil at the price of~~...............................................~~per ton.~~ 115
*Charterers have option for bunkering prior to delivery without interfering with Owners' operations.*
*Should the grade of bunkers that the vessel consumes not be available at Richards Bay Coal Terminal then Charterers*
*to have the option to replenish bunkers with the grade which is available at South Africa.*

*\* Same tons apply throughout this clause.* 116

The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and 117
auxiliaries and which conform to the specification(s) as set out in Appendix A. 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines 119
or the auxiliaries *or loss of time or other expenses* caused by the use of unsuitable fuels or fuels not complying with 120
the agreed
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed 121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners 122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker 123
consumption, nor for any time lost and any other consequences. *(See also Clause 51).* 124

### 10.    Rate of Hire/Redelivery Areas and Notices 125

The Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ ..39,750 (Thirty Nine Thousand* 126
*Seven Hundred and Fifty Dollars)*
U.S. currency, daily/pro rata, *including overtime, payable every 15 days in advance - First hire plus value of estimated* 127
*consumable bunkers for this voyage to be paid within 3 banking days after delivery* ~~or $  U.S. currency per ton on the~~
~~Vessel's total deadweight~~
~~carrying capacity, including bunkers and stores, on~~ ...........................................~~summer freeboard, per 30 days,~~ 128

commencing on and from the *hour of the* day of her delivery, as aforesaid, and at and after the same rate for any part | 129

of a ~~month~~ *day*; hire shall continue until the hour of the day of her redelivery in like good order and condition, | 130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) ~~at~~ *on dropping last outward sea pilot one safe* | 131
*port West Coast India, port in Charterers' option, at any time day or night, Sundays and holidays included (intention* | 132
*Mundra)* ................................................................................................................................... | 133
.............................................................................................. unless otherwise mutually agreed. | 134

The Charterers shall give the Owners not less than    *10* ........................................... days notice of the Vessel's | 135
expected date and probable port of redelivery *and 5/3/2/1 days notice of the vessel's definite date and port of* | 136
*redelivery.* 

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be | 137
adjusted to GMT *while lay/can to be based on local time.* | 138

**11.    Hire Payment** | 139

(a)    *Payment* | 140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in | 141
*Oslo*...................................................................., viz *DEN NORSKE BANK, OSLO* ........................... | 142
*SWIFT CODE: DNBANOKK    ACCOUNT/IBAN NO.: NO25 7091 04 43672* ........................................ | 143
*FAVOUR OF: BAUMARINE AS* ................................................................................................ | 144
*CORRESPONDING BANK: BANK OF NEW YORK, NEW YORK    SWIFT CODE: IRVTUS3N* .......................... in | 145
*REF: M/V SONGA HUI/LIBRA SHIPPING SERVICE L.L.C. - CP DD 30.03.2007* ~~currency, or~~ in United States | 146
Currency, in funds available to the
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate | 147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day | 148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire, | 149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to | 150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners) | 151
may otherwise have on the Charterers. | 152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the | 153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold | 154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever | 155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire | 156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the | 157
Charterers' account. | 158

(b)    *Grace Period* | 159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors | 160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners | 161
....*3*................... clear banking days (as recognized at the agreed place of payment) written notice to rectify the | 162
failure, and when so rectified within those *...3 clear banking* days following the Owners' notice, the payment shall | 163
stand as regular and punctual. | 164

Failure by the Charterers to pay the hire within *3 clear banking* days of their receiving the Owners' notice as | 165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above. *(See also Clause 58).* | 166

(c)    *Last Hire Payment* | 167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate | 168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and | 169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking | 170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for | 171
the Owners' account before redelivery *but maximum USD1,000/port unless supported by original* | 172
*vouchers/documents.* Should same not cover the actual time, hire is to be paid for the
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be | 173
refunded by the Owners or paid by the Charterers, as the case may be. *Charterers shall revert with their comments* | 174
*to Owners' preliminary final hire statement and pay the undisputed part thereof within 7 days of receipt, failing which*

*the total amount of Owners' statement becomes due and payable immediately.*

(d)    *Cash Advances*                                                                                                175

Cash for the Vessel's ordinary disbursements *including cash to Master, if any,* at any port may be advanced by      176
the Charterers, as required
by the Owners, subject to 2 1/2 percent commission and such advances shall be deducted from the hire.               177
The Charterers, however, shall in no way be responsible for the application of such advances.                        178

**12.    Berths**                                                                                                    179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that                  180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat            181
at any time of tide. *(See Clause 69).*                                                                              182

**13.    Spaces Available**                                                                                          183

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can                     184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the             185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,           186
apparel, furniture, provisions, stores and fuel.                                                                     187

~~(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the~~            188
~~Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a~~           189
~~result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.~~            190

**14.    Supercargo and Meals**                                                                                      191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'              192
risk and see that voyages are performed with due despatch. He/*she* is to be furnished with free                   193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of               194
*USD10.00* ........................................ per day. The Owners shall victual pilots and customs officers, and also, when   195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,               196
Charterers paying at the rate of *USD1,300* ................................ per *month or pro rata* ~~meal~~ for all such victualling   197
*/communications/entertainment.*

**15.    Sailing Orders and Logs**                                                                                   198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing              199
directions, in writing, in the Enqlish language, and the Master shall keep full and correct deck and engine        200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the           201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,              202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts                    203
....ired by the Charterers shall be in the English language.                                                         204

**16.    Delivery/Cancelling**                                                                                       205

If required by the Charterers, time shall not commence before *1200 hours local time 2nd April 2007* and should the   206
Vessel not be ready for delivery on or before *2400 hours local time 6th April 2007* ~~but not later than............hours,~~   207
the Charterers shall have the option of cancelling this Charter Party.                                               208

~~*Extension of Cancelling*~~                                                                                        209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready~~         210
~~for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty~~        211
~~the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is~~           212
~~expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will~~  213
~~cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two~~    214
~~days or the cancelling date, whichever shall first occur, then the seventh day after the expected date~~          215
~~of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the~~      216
~~Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers~~       217

~~in accordance with this Clause.~~ 218

**17.  Off Hire** 219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency 220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the 221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, 222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless 223
resulting from inherent vice, quality or defect of the cargo, *repairs,* drydocking for the purpose of examination or 224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of 225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back 226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident 227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time 228
of her deviating or putting back until she is again in the same or equidistant position from the destination 229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' 230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather, 231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses 232
resulting from such detention shall be for the Charterers' account. ~~If upon the voyage the speed be~~ 233
~~reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and~~ 234
~~the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be~~ 235
~~deducted from the hire.~~ *(See Clause 46).* 236

**18.  Sublet** 237

~~Unless otherwise agreed, the~~ *The* Charterers shall have the liberty to sublet the Vessel for all or any part of 238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this 239
Charter Party. 240

**19.  Drydocking** 241

~~The Vessel was last drydocked~~ ................................................................................................................. 242

*(a) ~~The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~ 243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~ 244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~ 245

*(b) ~~Except in case of emergency no drydocking shall take place during the currency of this Charter~~ 246
~~Party.~~ 247

*~~Delete as appropriate~~ 248
*No drydocking during this charter period except in case of emergency.*

**20.  Total Loss** 249

~~Sh~~ould the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or 250
being last heard of) shall be returned to the Charterers at once. 251

**21.  Exceptions** 252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the 253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always 254
mutually excepted. 255

**22.  Liberties** 256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels 257
in distress, and to deviate for the purpose of saving life and property. *All fuel used by the vessel while off-hire shall* 258
*be for Owners' account, except for deviation to save life at sea, in which case the total deviation time and cost of*
*bunkers to be shared equally by other Owners and Charterers.*

**23.  Liens** 259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due 260

under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. *(See Clause 58)*. 261 262 263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance, which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake that during the period of this Charter Party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time. *(See Clause 60)*. 264 265 266 267

### 24.   Salvage
268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion. 269 270

### 25.   General Average
271

General average shall be adjusted according to York-Antwerp Rules *1994,* ~~1974, as amended 1990,~~ or any subsequent modification thereof, in *London* ................................... and settled in ...........*United States* .................. currency. 272 273 274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules *1994,* ~~1974, as amended 1990~~, or any subsequent modification thereof and will include the "New Jason Clause" as per Clause 31. 275 276 277 278

Time charter hire shall not contribute to general average. *The Charterers to provide an Average Bond for their bunkers on board.* 279

### 26.   Navigation
280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, and all other matters, same as when trading for their own account. 281 282 283

### 27.   Cargo Claims
284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of February *1996,* ~~1970, as amended May, 1984,~~ or any subsequent modification or replacement thereof. 285 286 287

### 28.   Cargo Gear and Lights
288

~~The Owners shall maintain the cargo handling gear of the Vessel which is as follows:~~ ..................................... 289 290 291 292

~~providing gear (for all derricks or cranes) capable of lifting capacity as described.~~ The Owners shall ~~also~~ provide on the Vessel *sufficient* ~~for~~ night work lights as on board, but all additional lights *beyond* ~~over~~ those on board shall 293 294

be at the Charterers' expense. ~~The Charterers shall have the use of any gear on board the Vessel. If required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the Vessel is to be considered to be off-hire to the extent that time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which case the Vessel shall remain on hire.~~ 295 296 297 298 299 300 301 302

### 29.   Crew Overtime
303

~~In lieu of any~~ *Any* overtime payments to officers and crew for work ordered by the Charterers or their agents *to be for Owners' account.*~~,~~ 304

~~the Charterers shall pay the Owners, concurrently with the hire~~ ......................................................~~per month~~  305
~~or pro rata.~~  306

**30.    Bills of Lading**  307

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates  308
or tally clerk's receipts. However, the Charterers *or their Agents* may sign bills of lading or waybills on behalf of  309
the

Master, with the Owner's *and/or Master's* prior written authority, always in conformity with mates or tally clerk's  310
receipts. *Charterers shall provide Owners with fax copies of all Bills of Lading signed by Charterers or their agents.
Only 'clean' Mate's receipt to be issued and Master not to clause any mate's receipt. Master has the right to reject cargo
which he feels would prejudice signing 'clean' mate's receipt, however, such rejection to be reasonable. In the event
Master needs to reject any cargo, Master to inform agents and Charterers immediately. In case of any dispute with
respect to the cargo being 'clean', Owners and Charterers to appoint joint surveyor whose decision to be final and
binding.*

*Bill of Lading quantity to be determined by joint draft survey at the load port, with Owners being represented by either
their nominated surveyor or Master. Notwithstanding any clause or term in this Charter Party, it is expressly agreed
that Charterers or their agents have the right to issue Bills of Lading marked 'Freight Prepaid'.*

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall  311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency  312
between this Charter Party and any bills of lading or waybills signed by the Charterers *or their Agents* or by the  313
    ster

ot their request. *No Through or Liner Bills of Lading to be issued under this Charter Party.*  314

(c) ~~Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and~~  315
~~Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for~~  316
~~any loss, damage, expense or delay howsoever caused."~~  317

**31.    Protective Clauses**  318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of  319
lading or waybills issued hereunder, *save that the provision in (e) below shall not be included in any Bill of Lading or*  320
*Waybill, which instead shall include a 'Voywar 1993' Clause:*

(a)    CLAUSE PARAMOUNT  321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the  322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national  323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall  324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the  325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said  326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such  327
term shall be void to that extent, but no further."  328

and  329

(b)    BOTH-TO-BLAME COLLISION CLAUSE  330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any  331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in  332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against  333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents  334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other  335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the  336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.  337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or  338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or  339
contact."  340

and  341

(c)    NEW JASON CLAUSE  342

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. | 343
344
345
346
347
348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." | 349
350
351
352

and | 353

(d)   U.S. TRADE - DRUG CLAUSE | 354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel. | 355
356
357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account and the Vessel shall remain on hire. | 358
359
360
361
362
363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up the bails to secure release of the Vessel. | 364
365
366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel." | 367
368
369

and | 370

(e)   ~~WAR CLAUSES~~ | 371
*BIMCO Standard War Risks Clause for Time Charters, 2004*
*Code Name 'Conwartime 2004'*
*See Clause 80*
~~"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture, ~~ure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de authority or any purported governmental organization maintaining naval, military or air forces).~~ | 372
373
374
375
376
377

~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of ...................................................... In addition, the Owners may purchase and the Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ | 378
379
380
381
382
383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ | 384
385
386
387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the Charterers' account."~~ | 388
389

32.   War Cancellation | 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or    391
more of the following countries:   *United States of America, United Kingdom, Australia, People's Republic of China,*    392
*Japan, The Russian Federation, France, Germany, Norway, the country of vessel's flag,*    393
..........................................................................................................................................................................    394
..........................................................................................................................................................................    395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall    396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after    397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near    398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she    399
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall    400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this    401
Charter Party shall apply until redelivery. *(See Clause 70).*    402

**33.    Ice**    403

The Vessel shall not be required to *follow ice breakers or force ice nor proceed to* enter or remain in any icebound    404
port or area, nor any port or area
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is    405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely *proceed to,* enter    406
and
remain in the port or area or to get out after having completed loading or discharging. ~~Subject to the~~    407
~~Owners' prior approval the Vessel is to follow ice breakers when reasonably required with regard to her~~    408
~~, construction and ice class.~~    409

**34.    Requisition**    410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter    411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid    412
by the said government in respect of such requisition period shall be retained by the Owners. The period    413
during which the Vessel is on requisition to the said government shall count as part of the period provided    414
for in this Charter Party.    415

If the period of requisition exceeds *6 consecutive*.................................... months, either party shall have the option    416
of cancelling this Charter Party and no consequential claim may be made by either party.    417

**35.    Stevedore Damage**    418

*Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the*
*Charterers or their Agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but latest*
*when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to*
*obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in*
*the meantime.*

*edore damage affecting seaworthiness or the proper working of the vessel and/or her equipment, shall be repaired*
*without delay to the vessel after each occurrence in the Charterers' time and shall be paid for by the charterrs. Other*
*repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst vessel is in drydock in the*
*Owners' time, provided this does not interfere with the Owners' repair work, or by vessel's crew at the Owners'*
*convenience. All costs of such repairs shall be for the Charterers' account. Any time spent in repairing stevedore*
*damage shall be for the Charterers' account. The Charterers shall pay for stevedore damage whether or not payment*
*has been made by stevedores to the Charterers.*

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all~~    419
~~damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their~~    420
~~agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such~~    421
~~notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent~~    422
~~of such damage.~~    423

~~(a)    In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew~~    424
~~and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs~~    425
~~of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed~~    426
~~and if required passed by the Vessel's classification society.~~    427

~~(b)    Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,~~ 428
~~before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will~~ 429
~~be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for~~ 430
~~which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the~~ 431
~~Owners' work.~~ 432

36.   **Cleaning of Holds** 433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~ 434
~~voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~ 435
~~local regulations, at the rate of.................................................................................................per hold.~~ 436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not 437
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver 438
the Vessel with unclean/unswept holds against a lumpsum payment of  *USD5,000 ....* in lieu of cleaning *excluding* 439
*dunnage, lashing/debris removal which always at Charterers' time/risk/expense.*

37.   **Taxes** 440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners 441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter 442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding 443
taxes levied by the country of the flag of the Vessel or the Owners). 444

38.   ~~**Charterers' Colors**~~ 445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~ 446
~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~ 447
~~Party. Cost and time of painting, maintaining and repainting these changes effected by the Charterers~~ 448
~~shall be for Charterers' account.~~ 449

39.   **Laid Up Returns** 450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their 451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum 452
period of 30 days *if on full hire for this period* or pro rata for the time actually on hire. 453

40.   **Documentation** 454

The Owners shall provide any documentation relating to the Vessel *reasonably* ~~that may be~~ required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial 456
responsibility for oil pollution, ~~provided such oil pollution certificates are obtainable from the Owners'~~ 457
~~P & I club,~~ valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458
registry and certificates relating to the strength and/or serviceability of the Vessel's gear. *If during the currency* 459
*of the Charter Party any new or revised documentation or certificates should be required, the Owners shall have a*
*reasonable period of time to acquire such documentation.*

41.   **Stowaways** 460

(a)   (i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining 461
access to the Vessel by means of secreting away in the goods and/or containers shipped by the 462
Charterers. 463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained 464
access to the Vessel by means of secreting away in the goods and/or containers shipped by the 465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers 466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all 467
claims whatsoever which may arise and be made against them. Furthermore, all time lost and all 468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account 469
and the Vessel shall remain on hire. 470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to 471

sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a     472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the     473
Vessel.     474

(b)    (i)    If, despite the exercise of due care and diligence by the Owners, stowaways have gained     475
access to the Vessel by means other than secreting away in the goods and/or containers shipped     476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including     477
fines, shall be for the Owners' account and the Vessel shall be off hire.     478

(ii)    Should the Vessel be arrested as a result of stowaways having gained access to the Vessel     479
by means other than secreting away in the goods and/or containers shipped by the Charterers,     480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel     481
is released and at their expense put up bail to secure release of the Vessel.     482

## 42.  Smuggling     483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any     484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. *Smuggling by*     485
*Charterers/Charterers' servants to be for Charterers' account.*

## 43.  Commissions     486

ommission of  *1.25*  percent is payable by the Vessel and the Owners to    *MERIT MARITIME FZE*     487
..................................................................................................................................................     488
..................................................................................................................................................     489
..................................................................................................................................................     490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.     491

## 44.  Address Commission     492

An address commission of *3.75* percent is payable to *Charterers*     493
..................................................................................................................................................     494
..................................................................................................................................................     495
........................................................................................ on hire earned and paid under this Charter.     496

## 45.  Arbitration     497

(a)    ~~NEW YORK~~     498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~     499
~~subject to U.S. Law:~~     500

~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their~~     501
~~ ision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~     502
~~ greement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with~~     503
~~shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of~~     504
~~Maritime Arbitrators Inc.~~     505

~~For disputes where the total amount claimed by either party does not exceed US $ .......................................**~~     506
~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~     507
~~of Maritime Arbitrators Inc.~~     508

(b)    LONDON     509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree     510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business     511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,     512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No     513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as     514
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder     515
shall be governed by English Law.     516

For disputes where the total amount claimed by either party does not exceed US $  *100,000.00* .........................**     517

the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime      518
Arbitrators Association. *English Law to apply and arbitration, if any, to be in London, both substance and procedures*      519
*to apply: BIMCO/LMAA 1998 Arbitration Clause to apply.*

* Delete para (a) or (b) as appropriate      520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions      521
of this clause shall have full force and remain in effect.      522

If mutually agreed, clauses *46* .......................... to *81* ........................., both inclusive, as attached hereto are fully      523
incorporated in this Charter Party.      524

This Charter Party is a computer generated copy of the "NYPE 93" form printed by authority of the Association of Ship Brokers & Agents
(USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In
the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved
document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or
damage caused as a result of any discrepancies between the original approved document and this document.

## APPENDIX "A"

To Charter Party dated *30th March 2007*.............................................................................................................. 526
Between  *BAUMARINE A/S, OLSO*.................................................................................................. Owners   527
and  *LIBRA SHIPPING SERVICES L.L.C., DUBAI*........................................................................ Charterers   528

Further details of the Vessel: *SEE APPENDIX 'A' AS ATTACHED*...................................................................... 529
................................................................................................................................................................................. 530

## RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

**46. Speed and Consumption**

The performance details of the Vessel given in this Charter Party are based upon performance in good weather conditions and the words 'good weather conditions' shall mean any weather condition in which the wind force does not exceed Force 4 on the Beaufort Scale, sea condition up to sea state 3 on the Douglas Scale, and no adverse current.

The Vessel is allowed to use Marine Diesel Oil (ISO-F-DMB) when maneuvering and passing narrow/restricted/confined water, including when the Vessel carries out hold cleaning and bilge pumping.

a) Weather Bureau

Owners shall weather services from DMI to the Master/Vessel during any period of time/any specified voyage while under the present Charter Party. The DMI service cost shall be shared equally between Owners and Charterers. The Master shall comply with the reporting procedures of the weather service and follow its recommendations with regard to optimum course(s), but all times subject to the safety of the Vessel. Should the Vessel's Master elect not to follow DMI's recommendations, both DMI and Charterers shall be advised by radio message giving reasons for non-compliance.

b) Speed Claims/Mis-description

If during the currency of this Charter Party the speed of the Vessel (as described in Appendix A above) be reduced and/or oil fuel consumption be increased, Charterers shall, subject to Owners prior approval (which shall not be unreasonably withheld) have the right to deduct from hire an amount equivalent to the time lost and/or the cost of any extra fuel consumed. Evidence of wind and sea conditions shall be taken from the Weather services report and independent weather routing reports for the area. In the event of discrepancies between the two, the Weather services report shall prevail.

**47. Hold Cleanliness on Delivery**

Further to Clause 2, vessel's holds on arrival at first loading port to be clean swept, washed down by fresh water and dried up so as to receive Charterers' intended cargo in all respects to the satisfaction of shippers' independent surveyor and if vessel fails to pass any hold inspection as above, the vessel should be placed off-hire until the vessel passes the same inspection again. Any directly related expenses incurred due to this failure to be for Owners' account.

**48. Insurances**

*a)*    *Hull and Machinery:* The Owners warrant that the Vessel is insured under Institute Time Clauses or similar clauses for IWL trading against loss, damage and collision liabilities for the insured value as stated in Appendix A which cover will be maintained throughout the currency of this Charter Party. Upon 10 days notice to Charterers, the Owners shall be entitled to effect any reasonable change to the insured value

# RIDER CLAUSES TO M.V. "SONGA  HUI"
## CHARTER PARTY DATED 30TH  MARCH  2007

**b)**   *Protection and Indemnity (P&I)*:  The Owners and the Charterers warrant that the Vessel is entered on full terms with their respective P&I clubs as indicated in Appendix A and that such entries will be maintained with all calls paid up to date throughout the currency of this Charter Party.  The Owners and the Charterers shall not change P&I clubs without the prior

   written consent of the other party, which shall not be unreasonably withheld.

**c)**   *War Risks*:  Notwithstanding the provisions of clause 31(e) 4(a), the Owners warrant that the Vessel is insured against loss of the Vessel by war risks and War P&I Risks for IWL trading excluding additional premium/restricted/prohibited areas, which cover will be maintained throughout this Charter Party.

**d)**   *Charterers' Liability to Hull*:  The Charterers undertake to take out Charterers' liability to Hull insurance for the insured value as stated in Appendix A for the period of this Charter Party.

### 49. Certificates
Further to Clauses 6 and Clause 40, the Charterers particularly require that the Vessel, on delivery and during the currency of this Charter Party, will be in possession of the following certificates and will comply with the following regulations:

**a)**   The Australia Maritime Safety Authority loading and unloading safety measure regulations, including their Navigation (Orders) Regulations Section 32 which refers to cargo gear, hold ladders.

**b)**   Valid and approved cargo gear register with certificates.

**c)**   SOLAS 1974 (pertaining to loading grain cargoes and the Vessel's approved grain loading plan should refer to untrimmed both ends). Vessel shall have onboard an approved grain-loading certificate from the Vessel's country of registry.

**d)**   I.L.A. Convention Number 32 which statutory in the U.S.A. under Public Law 85-742, Part 9 - Safety and Health Regulations for Longshoring.

**e)**   The United States Department Labor Safety and Health Regulations including as set forth in Part III of the Federal Register.

**f)**   International Tonnage Certificate - Rules 1969.

**g)**   Valid Deratization Exemption Certificate.

### 50. Vessel Services
The following services are included in the hire and shall be rendered by the Master, Officers and Crew if permitted by shore regulations, without any additional payment:

2

# RIDER CLAUSES TO M.V. "SONGA  HUI"
## CHARTER PARTY DATED 30TH  MARCH  2007

a)     Raising and lowering of gangways in preparation for loading and discharging.

b)     Opening and closing of hatches in connection with loading and discharging.

c)     Closing and opening of hatches in the event of weather that may adversely affect the condition of cargo carried on board during loading and discharging.

d)     Supervision for loading and discharging and everything related hereto.

e)     Shifting Vessel during loading and discharging and shifting berth.

f)     Docking and undocking in connection with loading/discharging cargo or bunkering.

g)     Necessary assistance in the Vessel's bunkering operation.

h)     Officers and Crew shall shape up Vessel's hatches as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the services to be rendered by Officers and Crew in accordance with the maritime code of the country under whose flag the Vessel sails or in accordance with what is customary practice in the trade.

### 51. Bunkers
Charterers shall supply suitable fuel and diesel oil to enable the Vessel's main propulsion and auxiliary machinery to operate efficiently and without any harmful effects. Sufficient quantities of bunker shall be kept onboard to meet the safety requirements. Products shall be mineral based of stable and homogeneous nature and shall not contain any waste lubricants, tar oil, inorganic acid, chemical and nuclear waste or any harmful substance and to be in compliance with: ISO 8217, 1996 (E) - or any subsequent amendment thereof ISO-F-RMG 35 (380 CST) ISO-F-RME 25 (180 CST) ISO-F-DMB/DMA (MDO).

Owners have an option to arrange a joint bunker quantity/quality survey for every Charterers' bunkering whereby the cost shall be for Owners' account and the result is binding on both parties. Charterers shall keep Owners fully informed of their bunkering program.

Master shall adhere strictly to Charterers' bunkering instructions at all times during the currency of this Charter Party.

Owners shall have the right to bunker the Vessel for their own account during this Charter Party provided same does not interfere with Charterers' operations and/or cargo lift. Charterers have the liberty to bunker the Vessel prior to delivery provided same does not interfere with Owners' operations.

3

# RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

Charterers shall take over and pay for the value of bunkers on delivery together with the first hire payment.

Owners warrant that the Vessel is eligible and equipped to bunker in the U.S.A., its territories and possessions and in all countries to which Vessel is allowed to trade under this Charter Party.

### 52. Cancellation Clause
In case the vessel is off-hire for more than thirty (30) consecutive days, Charterers shall have the right to cancel the remaining period of this Charter Party, provided the vessel has no cargo onboard or as soon as the vessel is free of cargo should she have cargo onboard, without prejudice to Charterers' rights under this Charter Party.

### 53. Arrest of Officers/Crew
Should the Vessel and/or her Master and/or any other of her officers and crew be arrested for whatsoever reasons, during the currency of this Charter Party at the suit of any person having or purporting to have a claim against, or any interest in the Vessel and/or her Master and/or any of her officers and crew, hire under this Charter Party shall not be payable in respect of any period while the Vessel remains unemployed as the result of such arrest and the Owners shall reimburse to Charterers any expenditure directly related to the Vessel which they may incur under this Charter Party in respect of any period during which by virtue of the operation of this clause no hire is payable.

### 54. Port Agency/Husbandry Items
Owners shall appoint Owners' Agent for major matters like crew joining, major repairs, etc. However, Charterers' Agent shall assist Master on minor matters like telex, mails, crew visit of doctor, cash advance to Master, etc. free of agency fee and Owners shall reimburse Charterers' actual expenses as per invoice. Charterers shall advise Owners the details of their Agent soonest possible.

### 55. Condition Inspection
Charterers shall have the option of holding a condition inspection at any time during the currency of this Charter Party, the Owners and Master giving any facility and assistance to carry out this inspection which shall be carried out without interrupting the working of the Vessel and without incurring expense for the Owners and the Vessel shall remain on hire at all times.

### 56. I.T.F.
The Owners of the Vessel guarantee that the minimum terms and conditions of employment of the crew of the Vessel are now or will be prior to presentation of the Vessel for delivery under this Charter Party and will remain for the period of this Charter Party covered by an I.T.F. Agreement or a bona fide Trade Union Agreement acceptable to the I.T.F. Loss of time due to delay to the Vessel or interference with Charterers' use of the Vessel by strikes or labor (union(s) or workers) manifestations or stoppages in any form on account of the Vessel's manning or wage pattern and any expenses resulting there from to be for Owners' account.

4

# RIDER CLAUSES TO M.V. "SONGA HUI"
# CHARTER PARTY DATED 30TH MARCH 2007

**57. Information of Vessel's Itinerary etc.**
As far as is known the Charterers shall give the information of Vessel's itinerary, kind of cargoes and names of agents at ports of call to the Owners as soon as known or upon Owners' request.

**58. Lien**
In addition to the right of lien conferred on the Owners according to the provisions of Clause 23, the Owners shall have a lien over the bunkers on board, as well as over any sums due to Charterers under any Sub-Charter Parties (in addition to freight and sub-freights, hires and sub-hires), for any amounts due under this Charter Party.

Furthermore, in the event the Owners exercise their liberty to withdraw the Vessel in accordance with the provisions of Clause 11, the ownership of any bunkers remaining on board shall thereupon vest in the Owners, who shall allow Charterers by way of credit against any sum due to the Owners the value of such bunkers calculated in accordance with the provisions Clause 9.

**59. Radio Clause**
The Vessel shall communicate with Charterers via Satcom or E-mail if available. Alternatively, Vessel shall communicate by cable via a radio station. When communicating by cable the Master shall keep a strict listening watch to the radio stations requested by the Charterers.

**60. Charters' Procurement**
In no event shall Charterers procure, or permit to be procured, for the Vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnisher claims no maritime lien on the Vessel therefore.

**61. Double Banking Clause**
a)    The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

b)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations

c)    Without prejudice to the generality of the Charterers' rights under a) and b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in a) and b) if in his reasonable opinion it is not safe so to do.

5

# RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

d)    The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

e)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

This Clause is applicable for ship to ship operation only and not applicable for customary barge loading operation at Indonesian anchorage.

### 62. Extended Port Stay
Whenever the Vessel is scheduled to call at a port where risks of long stay at the roads due to congestion prevail, the Master at the Charterers' request shall exercise due diligence to victual Vessel in every respect so as to allow such long stay without undue deviation/time lost on account of insufficient provision or fresh water and/or any other supply/stores. If the Vessel is fouled because of long stay (over 30 days) in one port, Charterers shall not hold Owners responsible for any speed claim, and underwater brushing, if required by Charterers, shall be for Charterers' account.

### 63. Vouchers
Charterers shall provide supporting documents in respect of Owners expenses deducted from hire in connection with port calls within 60 days of each port call, failing which the relevant deduction shall become due and repayable to Owners immediately.

### 64. Water Ballast
Charterers have the right to instruct the Master to utilize the Vessel's maximum water ballast capacity including hold ballast in order to bring down the Vessel's height to get into position under loading and/or discharging appliances, however, always in conformity with free board, stability and/or safety requirements.

### 65. Cargo Holds
Owners warrant that the Vessel is suitable for discharge by means of mechanical grabs and any damage caused to the Vessel's fittings lying beneath cargo in holds accessible to a grab shall be for Owners' account.  Charterers shall have the option to use bulldozers on rubber tires in the Vessel's holds but weight of bulldozer to be within permissible tank top(s) strength.

### 66. Hatch Covers
Owners warrant that Vessel's hatch covers are watertight, and if any hatch cover is found defective, same shall be rectified at Owners' time and expense to class' satisfaction.  All hatch covers shall be carefully tended by crew to prevent leakage.

### 67. Oil Pollution Charter Party Clause
(1)    Owners warrant that throughout the currency of this Charter Party they will provide the Vessel with the following certificates:

6

# RIDER CLAUSES TO M.V. "SONGA HUI"
# CHARTER PARTY DATED 30TH MARCH 2007

Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from [*indicate the earliest date upon which the Owners may be required to deliver the Vessel into the charter*], so long as these can be obtained by the Owners from or by [*identify the applicable scheme or schemes*].

(2)   Notwithstanding anything whether printed or typed herein to the contrary,

a)   save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter Party.

b)   Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the Vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

c)   Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3)   Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this Charter Party.

## 68. Presentation of Bills of Lading

Charterers shall use their best endeavor to present the original Bills of Lading for discharge of the cargo at the discharge port.   If original Bill(s) of Lading are not available at discharge port, Owners allow Charterers to discharge entire cargoes against Charterers' presentation of Letter of Indemnity signed by Charterers' authorised signatory only with wording provided by Owners' P and I Club.

Master will release the cargo to the consignees named in the Letter of Indemnity.   Charterers hereby undertake to surrender the original Bills of Lading to Owners within 2 months of completion discharge.

Charterers hereby undertake to indemnify Owners against any and all consequences arising from Owners' complying with Charterers' request to discharge the cargo against the Letter of Indemnity without production of the original Bills of Lading.

7

## RIDER CLAUSES TO M.V. "SONGA  HUI"
## CHARTER PARTY DATED 30TH  MARCH  2007

**69. Trading Exclusions**

Amazon River, Angola, Congo, Cuba, East Coast of C.I.S., Eritrea, Ethiopia, Finland, Israel, Iraq, Nicaragua, North Korea, Serbia and Montenegro, Sierra Leone, Sri Lanka, Somalia, Turkish occupied cypress, Yemen. Vessel shall not sail directly between PRC/Taiwan or vice versa. This exclusion shall include any United Nations sanctioned area and war/warlike/war risk zones where declared by insurance underwriters or areas for which such underwriters have issued a notice that the area will be classified as such in future. Iraq always excluded.

At the request of the Charterers, Owners will consider to call the excluded areas in the war risk zones on a case by case basis but always subject to war risk insurance cover being available and that any additional premium for calling the area and/or port, including the crew war bonus, at the insurance underwriters prevailing rate shall be for Charterers' account. Underwriters' approval shall be declared 48 hours prior arrival/entering war risk zones.

Notwithstanding the above, Owners' rights shall not be prejudiced under the current Charter Party and/or any other conventions and/or regulations and/or policy and/or direction by the management and/or the country of the flag that may rule in such circumstances.

In the event that actual hostilities or acts of terrorism occur in ports or areas to which the Vessel is trading, Owners shall be entitled to take whatever steps are necessary to ensure the safety of the Vessel, her crew and cargo and no such actions shall constitute a breach of this Charter Party.

The BIMCO war risk clause (Voywar 1993) shall be incorporated in all Bill(s) of Lading issued hereunder.

Charterers shall have the option to let the Vessel lie safely aground, (NAABSA) in River Plate, River Parana, River Uruguay, Argentina and Brazil only, as per the following NAABSA Clause:

That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place that Charterers or their agents may direct, provided the Vessel can safely lie always afloat at any time of tide, except at River Parana, River Plate, River Uruguay, Argentina and Brazil only, where it is customary for similar size vessels to safely lie aground.

**70. War Cancellation**

With respect to Clause 32, "War Cancellation", it is understood that war means direct war between nations and does not include local hostilities or civil war where any of the countries mentioned therein support opposing sides. Neither party shall have a right to cancel unless the hostilities have a material impact on the trading of the Vessel.

**71. Mobile Crane Clause**

Charterers shall notify Owners of their intention to place mobile crane(s) on deck to facilitate discharge of cargo in Taiwan.

## RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

All cost and time shall be for Charterers' account and sufficient dunnage shall be placed underneath the crane(s) to spread the weight. In any case, the weight of the crane(s) must not exceed permissible weight per square meter on deck of the Vessel. Where necessary Charterers may be allowed to weld iron rings to the main deck for use in lashing/securing mobile crane(s). Expenses and time for such work shall be for Charterers' account and such work shall always be carried out subject to classification society surveyor's approval. Charterers shall be fully responsible for any and all damages. Time, expenses and costs shall include but not be limited to all burn area of paints on deck and underneath which shall be reconditioned to original state. All operations shall be under Master/Officer's supervision and to classification society's satisfaction.

**72. Bulk Carrier Safety Clause**
1)   The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the 'IMO ship/shore safety checklist' and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

2)   In addition to the above, the Charterers shall instruct the terminal operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

3)   At any time during cargo operation the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

"The IMO ship/shore safety checklist" is available from the BIMCO secretariat.


**73. BIMCO ISM Clause**
During the currency of this Charter party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**74. U.S. Security Clause for Time Chartering**
If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and

# RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

### 75. U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

a)    If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)   Have in place a SCAC (Standard Carrier Alpha Code);

    ii)  Have in place an ICB (International Carrier Bond);

    iii) Provide the Owners with a timely confirmation of i) and ii) above; and

    iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

b)    The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

d)    The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

### 76. ISPS/MTSA Clause

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

10

# RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the

Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**77. Confidentiality**
All negotiations / eventual fixture shall be kept strictly private and confidential.

**78. MARPOL Annex VI Clause for Time Charter Parties**
From the date of coming into force of MARPOL Annex VI (the "Annex") and thereafter during the currency of this Charter Party:

(i)    The Charters shall

11

# RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

a)  supply fuels of such specifications and grades to permit the Vessel, at all times, to meet the maximum sulphur content requirements of the Annex and any emission control zone when the Vessel is trading within that zone; and

b)  procure that any fuel supplier issues and delivers to the Vessel a bunker delivery note containing the information required by the Annex; and

c)  procure that any fuel supplier in compliance with the Annex participates in the taking, sealing and signing of a representative sample of the fuel delivered to the Vessel.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(ii)  The Owners shall procure that the Vessel

a)  complies with the requirements of the Annex relating to the Vessel, and

b)  if trading within any emission control zone has been agreed, is able to separate and consume supplied fuels with different sulphur contents.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners to comply with the requirements of the Annex or this Clause shall be for the Owners' account. Delay, costs or expenses arising out of or related to the storage, changeover and/or consumption of fuels with different sulphur content, shall be for the Owners' account.

For the purposes of this Clause, "emission control zone" shall mean zones as stipulated in the Annex and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## 79.  Switching and Splitting Clause

Charterers have the right to switch bills after completion of discharging. Second instance Bills of Lading to be signed and released in Dubai/Singapore by Charterers or their nominated Agents in Dubai/Singapore. Owners to authorise Charterers or their nominated Agents to issue and release second set of Bills of Lading by telex. Such authority to be sent by Owners immediately upon Owners receiving the first instance Bills of Lading from Charterers or their Agents by courier or mail or by Charterers confirming in writing to Owners that they are in possession of the first set of Bills of Lading and same have been duly cancelled. Second instance Bills to be in conformity with the first instance bills except for shippers, receivers and notifying party and minor changes in cargo description. Second instance bills to be split as required by Charterers. Charterers in indemnify Owners for all consequences of such switching and splitting of Bills of Lading with a simple faxed  Letter of Indemnity in Owners' P + I Club format signed by Charterers only and without any counter signature or guarantees.

# RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

80.   BIMCO CONWARTIME 2004

War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at

13

## RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

14

## RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

81.

If original Bill(s) of Lading not available at discharge ort, Owners allow Charterers to discharge entire cargoes against Charterers' presentation of Letter of Indemnity signed by Charterers' authorised signatory only with wording provided by Owners' P and I Club.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### APPENDIX 'A'

VESSEL'S DESCRIPTION

MV 'SONGA HUI'
==============
MHL FLAG BLT 2001
74832MT DWT ON 14,27M
TPC 172,72
LOA/BM 225M/32,26M
GRT/NRT 40437/25855
7/7 HO/HA
GRAIN 3.203.651,18 CB.FT
ABT 13,75K ON ABT 30MT(B)/ABT 13,5K ON ABT 32MT(L) 380 CST
+ ABT 0,1MT MDO
IN PORT ABT 2 MT HFO + ABT 2 MT MDO
ALL DETAILS ABOUT

OTHERWISE AS PER BELOW FULL SPECIFICATION

- OWNERS CONFIRM VESSEL COMPLY WITH RBCT RULES AND REGULATIONS
  AND NOT BLACKLISTED BY THE TERMINAL.

A) OWNERS GUARANTEE THAT VSL IS CLASSED TO LLOYDS 100 A1 OR
EQUIVALENT  AND WILL REMAIN SO FOR THE DURATION OF THIS VOYAGE.
  VESSEL'S CLASS : CHINA CLASSIFICATION SOCIETY

B) OWNERS GUARANTEE THAT VSL IS ENTERED WITH AND INSURED FOR
  INTENDED  CARGO RISK WITH A INTERNATIONAL GROUP PNI CLUB AND
  WILL REMAIN  SO FOR THE DURATION OF THIS VOYAGE AND THAT ALL

15

## RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

CALLS, INCLUDING  SUPPLEMENTARY CALLS ARE FULLY PAID UP.
OWNERS PNI CLUB: ASSURANCEFORENINGEN GARD

C) OWNERS GUARANTEE THAT VSL IF FULLY H+M INSURED AT A VALUE OF USD
  32 MILLION AND WILL REMAIN SO FOR THE DURATION OF THIS VOYAGE.
  H & W U/W: NORWEGIAN HULL CLUB

D) OWNERS GUARANTEE THAT ALL VESSEL'S CERTIFICATES ARE VALID
  AND FULLY   UPTO DATE AND OWNERS ACCEPT TO MAKE SAME AVAILABLE
  TO CHARTERERS FOR  INSPECTION, IF REQUESTED.

E) OWNERS GUARANTEE THAT VSL'S HOLDS ARE FREE OF ANY
  OBSTRUCTIONS /  BULKHEADS / STANCHIONS, AND THAT VESSEL IS IN
  EVERY WAY SUITABLE TO  SHIP/LOAD/DISCHARGE THE  INTENDED CARGO.

F) DELETE

G) VESSEL IS NOT DISPONENTLY OWNED AND ORIGINAL OWNERS ARE
  PERFORMING  THE CHARTER. OTHERWISE PLEASE ADVISE HEAD OWNERS' /
  DISPONENT OWNERS' NAME :
  BAUMARINE A/S, OSLO, NORWAY AS DISPONENT OWNERS

H) PLEASE ADVISE MASTER' S STOW PLAN FOR CARGO LOADING. :
  OWNERS/MASTER  REVERTING
  full cargo basis abt 41sf and abt 42sf bulk coal
  loading Richards Bay Coal Terminal and discharge Mundra
  no draft restrictions bends

I) VESSEL HAS NO OBSTRUCTIONS ON DECK OR SHIP'S SIDE ALLOWING CLEAR
  ACCESS FOR MOBILE CRANES TO ALL HOLDS/HATCHES

J) OWNERS CONFIRM VESSEL HAS NO UNPUMPABLE OR PERMANENT
  BALLAST ON BOARD


(DESCRIPTIONS)

All details about:

Vessel's name:  SONGA HUI
Vessel's previous name(s):  DE HUI HAI
Flag: MHL
Year/month/where built (yard): 2001/NOV/HUDONG ZHONGHUA SHIPPING, CHINA
Vessel is selftrimming singledeck
bulkcarrier with engine/bridge aft: Yes

## RIDER CLAUSES TO M.V. "SONGA HUI"
## CHARTER PARTY DATED 30TH MARCH 2007

Vessels manager: OSM SHIP MANAGEMENT PTE. LTD., SINGAPORE
Managers address: NO. 1 SHENTON WAY, # 19-08. SINGAPORE 068803
Managers phone/fax/e-mail: +65 6221 2533/+65
62213713/osm.sin@osm.no/knut.egeberg@osm.no
Registered Owners: Songa Shipping Pte. Ltd
#22-05 Millenia Tower
One Temasek Avenue
Singapore 039192

Tel: + 65 6336 3493
Fax: + 65 6339 0559
Email: mail@songa.com.sg
Vessel's call sign/telex/telephone/fax: V7KU7///
Vessel's e-mail:
Vessel's classification society/full class notation/IMO number:
CHINA CLASSIFICATION SOCIETY/"CSA 5/5 BULK CARRIER CCSS
STRENGTHENED FOR
HEAVY CARGOES HOLDS 2,4,6 MAY BE EMPTY. HOLD 4 MAY BE BALLASTED-
"CSM AUT-O
CMS"/9261360

MAIN PARTICULARS:
Loa/beam/depth moulded/LBP: 225/32,26/19,6/217
Summer deadweight/draft/TPI/TPC: 74832/14,27/68t/cm/172,72
Winter deadweight/draft: 73000/13,98
Tropical deadweight/draft: 76750/14,56
International gross/net: 40437/25855
Suez net/Panama net: 38429/33423
Constants excl. freshwater: 0
Freshwater capacity: 482
DWAT Panama (dead weight all told):
Confirm vessel holding dual load line: N/A
Lightweight:

CARGO SPACE/HATCHES:
Number of holds/hatches: 7/7
Grain/bale cap each hold (including hatch) in CB.FT:
No 1:399246,43 / 391261,78
No 2:442736,44 / 468491,42
No 3:478467,82 / 468897,54
No 4:478467,82 / 468897,54
No 5:478467,82 / 468897,54
No 6:478467,82 / 468897,54
No 7:447797,03 / 438841,23

17

## RIDER CLAUSES TO M.V. "SONGA  HUI"
## CHARTER PARTY DATED 30TH  MARCH  2007

Total 3203651,18/3174184,59
Corrugations vertical or horizontal: Vertical
Natural or mechanical ventilation in holds: Mechanical
Holds are CO2 fitted: No
Strengthened for carriage of heavy cargoes in
alternate holds: Yes
If yes, which holds may be left empty: NO 2,4,6
Is vessel grain fitted in accordance with SOLAS 1974 and/or
later amendments without requiring bagging/strapping/securing
when fully laden with grain: No
Number of holds that may be left slack without requiring
bagging/strapping/securing: NO. 1 AND NO. 5
Type of hatchcovers: TWO SECTION, DOUBLE SKIN, SIDE ROLLING TYPE
Confirm hatches are fitted with permanent cement holes: Yes
If yes please advise number, dimensions and
location each hatch: PORT SIDE: FWD, STBD. SIDE: AFT
Is the vessel log fitted: No
Confirm whether vessel fitted W.W.F. (Australian hold ladders): Yes
A   Length/beam of each tanktop Length/Beam
No 1. 24,08/32
No 2. 25,8/32
No 3. 25,8/32
No 4. 25,8/32
No 5. 25,8/32
No 6. 24,94/32
No 7. 25,8/32
B   Length/beam of each hatch Length/Beam
No 1. 16,62/13,2
No 2. 14,62/15
No 3. 14,62/15
No 4. 14,62/15
No 5. 14,62/15
No 6. 14,62/15
No 7. 14,62/15
C Strength of hatch covers: 1,78 MT/M2
D Strength of tanktops NO 1: 24,45
NO 2: 17,30
NO3: 28,52
NO 4: 19,40
NO 5: 28,52
NO 6: 17,30
NO 7: 26,15
E Strength of deck: 2,4 MT/M2
F Distance keel to highest point on vessel: 48,9 mtrs

18

# RIDER CLAUSES TO M.V. "SONGA  HUI"
## CHARTER PARTY DATED 30TH  MARCH  2007

G Distance fwd hatchcoaming 1st hatch-aft
hatchcoaming last hatch: 142,76 mtrs
H Distance from railing to hatchcoaming each side: 8,65 mtrs
I Waterline to top of hatchcoaming in heavy ballast condition: 14,20 mtrs
Number/type of hold cleaning equipment:/

BALLAST SYSTEM:
Ballast capacity without flooding hold(s):  20218 m3
Which hold(s) may be flooded:  no 4 hold
Ballast capacity with hold(s) flooded: 34367,6 m3
Number / capacity of ballast pumps:  2 /  1200m3
Time required to deballast without
hold(s) flooded, and with hold(s) flooded:10/16 hrs
Draft heavy ballasted forward/aft: 8,07 MTRS/9,42 MTRS

ENGINE ROOM:
Make/type/BHP of main engine/
fuel specification:  B&W/5S60MC-MK6, 5 CYLINDERS/8550 KW AT 92 RPM/380 CST
Number/make/type/KWH of auxiliary engines and
fuel specification: 3/YANMAR DIESEL/6N 18AL-SV/662 KW (each) at 900 RPM/
Number/type of fuel separators: FO: 01/ALFA LAVAL-NAN TONG MOPX207
DO: 01/ALFA LAVAL-NAN TONG MOPX207
LO: 02/ALFA LAVAL-NAN TONG MOPX205/
Are fuel separators operated in series or parallel: N/A
State whether one/more spot sample(s) is/are taken
during fuel bunkering or continuous drip samples are
taken throughout such operations:  DRIP SAMPLES TAKEN THROUGHOUT
Also state if vessel participates in Lloyds/DNV fuel
testing programs: YES
IFO and MDO capacity in MT: 2475/134
State whether fuel is tested onboard during bunkering:  No
If yes, state which parameter(s) are tested:

MASTER/OFFICERS/CREW:
Name/nationality of master:  RUBEN BAYLON REDOSENDO/
Number/nationality of officers and crew:  21 /FILIPINO
Master and senior officers speak, read and write English: Yes
Vessel has sufficient crew for driving cranes/cleaning
holds 24 hrs per day (separately, not simultaneously):Yes

MISCELLANEOUS:
Name of vessels H&M underwriters: NORWEGIAN HULL CLUB
Total insured value: US$ 32000000
Name of owner's P&I club: ASSURANCEFORENINGEN GARD

# RIDER CLAUSES TO M.V. "SONGA  HUI"
## CHARTER PARTY DATED 30TH  MARCH  2007

Validity date of cover: W.E.F. 12TH SEPT 2006 TILL CANCELLED
Freshwater daily production / daily consumption:25 / 15
There are no outstanding recommendations or
conditions from classifications society or
Port State control: True

SURVEYORS:
Status of following class surveys: Last done/place/Next due
Hull special survey23.11.2001/22.11.2006
Dry-docking10.01.2007/
Hull annual survey09.12.2005/09.12.2006
Boiler survey19.12.2004/22.11.2006
Machinery continuous survey23.11.2001/22.11.2006

20